Curtis W. GARROTT
v.
The UNITED STATES.
No. 19–63.

United States Court of Claims.
Jan. 22, 1965.

Richard J. Scupi, Washington, D. C., for plaintiff, Hal Witt and James H. Heller, Washington, D. C., of counsel.

Joan T. Berry, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE and DAVIS, Judges, and WHITAKER, Senior Judge.

DAVIS, Judge.

From November 1922 until May 1949, plaintiff, a citizen, worked for the Post Office Department. During his employment, deductions were regularly made from his salary and deposited in a retirement fund maintained by the Federal Government, under the Civil Service Retirement Act, as amended, 5 U.S.C. § 2251 et seq. In October 1948 he received notice that the Department proposed to remove him, under Executive Order No. 9835, 12 Fed.Reg. 1935 (1947), 5 U.S. C.A. Cum.Supp. § 631, note,[1] because there was reasonable ground to believe that he was disloyal to the Government of the United States. Plaintiff filed an answer and requested a hearing. He did not, however, appear at the hearing, but withdrew his request. The Departmental Loyalty Board sustained the charge; plaintiff did not appeal to the Postmaster General. On May 20, 1949, he was removed on the basis of the Board's findings (which were approved by the head of the Department). At that time plaintiff, who was a little less than 50 years old, had satisfied all the then-existing requirements for receiving a Government

1. Issued March 21, 1947, and entitled "Employees Loyalty Program in the Executive Branch of the Government."

employee's retirement annunity when he reached the age of 62.

Plaintiff became 62 on July 13, 1961. He applied to the Civil Service Commission for his annuity on September 30, 1961; after routine processing, the Commission granted the application on March 2, 1962 (effective from his 62nd birthday) and awarded a monthly annuity of $121. Three months later, on June 14, 1962, the Commission wrote plaintiff that it was investigating whether his receipt of civil service retirement pay was precluded by Section 2 of Public Law 87–299,

the Act of September 26, 1961, 75 Stat. 640, 642–43, 5 U.S.C. § 2283 (1958 ed., Supp. V),[2] prohibiting, among other things, annuity payments to a person who knowingly and willfully made false representations or concealed any material fact with respect to his past or present membership in, affiliation or association with, or support of, the Communist Party or any organization which advocates the overthrow of the Government of the United States by force, violence, or other unconstitutional means.[3]

2. Public Law 87–299, of September 26, 1961, was a revision and amendment of the so-called "Hiss" Act of September 1, 1954, 68 Stat. 1142 (amended 70 Stat. 761), which bore the title, "An Act to prohibit payment of annuities to officers and employees of the United States convicted of certain offenses, and for other purposes." In 1958, this court invalidated (as applied to a Government employee who had retired and was receiving an annuity before the enactment) the portion of the 1954 Act which denied an annuity to a person who thereafter invoked his constitutional privilege against self-incrimination before a federal grand jury with respect to his federal service. Steinberg v. United States, 163 F.Supp. 590, 143 Ct.Cl. 1 (1958). The 1961 Act deleted that provision, as well as others relating to nonsecurity offenses like theft, embezzlement, etc., and in the main restricted the denial of annuities to persons convicted of crimes, or shown to have committed injurious acts, involving or affecting the national security or defense.

3. The pertinent provisions of Section 2 of the 1961 Act read as follows: "(b) There shall not be paid to any person who, prior to, on, or after September 1, 1954, knowingly and willfully, has made or makes any false, fictitious, or fraudulent statement or representation, or who, prior to, on, or after such date, knowingly and willfully, has concealed or conceals any material fact, with respect to his—

"(1) past or present membership in, affiliation or association with, or support of the Communist Party, or any chapter, branch, or subdivision thereof, in or outside the United States, or any other organization, party, or group advocating (A) the overthrow, by force, violence, or other unconstitutional means, of the Government of the United States, (B) the establishment, by force, violence, or oth-

er unconstitutional means, of a Communist totalitarian dictatorship in the United States, or (C) the right to strike against the Government of the United States,

"(2) conviction, under any article or provision of law specified or described in subsection (a) of the first section of this Act, of any offense within the purview of such subsection (a) to the extent provided in such subsection, or

"(3) failure or refusal to appear, and testify, or produce any book, paper, record, or other document, as specified in subsection (a) of this section, for any period subsequent to September 1, 1954, or subsequent to the date on which any such statement, representation, or concealment of fact is made or occurs, whichever date is later, in any document executed by such person in connection with his employment in, or application for, a civilian or military office or position in or under the legislative, executive, or judicial branch of the Government of the United States or the government of the District of Columbia, or to the survivor or beneficiary of such person, any annuity or retired pay on the basis of the service of such person (subject to the exceptions contained in section 10(2) and (3) of this Act) which is creditable toward such annuity or retired pay."

The comparable portion of Section 2 of the 1954 Act provided: "(b) There shall not be paid to any person who, prior to, on, or after the date of enactment of this Act, knowingly and willfully has made or makes any false, fictitious, or fraudulent statement or representation, or who, prior to, on, or after such date, has concealed or conceals any material fact, with respect to his—

"(1) past or present membership in, affiliation or association with, or support of the Communist Party, or any chapter, branch, or subdivision thereof, in or out-

The letter said that the Commission had information in its files that plaintiff had joined the Communist Party in 1937 under an assumed name, receiving a numbered membership book and being assigned to a Party section in Los Angeles; that he attended Party meetings in 1941 at the home of another member; and that when interviewed in December 1941 by a Government representative, in connection with his federal employment, he had given a signed statement that he was not then, and had never been, a member of the Communist Party and had never attended a Communist meeting. The Commission asked plaintiff to file a signed reply, commenting on or explaining this information.

Plaintiff's response, of June 28, 1962, requested "that the matter be explored by way of an open hearing, if that is possible, at which time I would request the right to inquire into your sources of information and to be apprised of the names of persons who have related the 'information disclosed by investigation in the case of Curtis W. Garrott'." His attorney also sought an open hearing. The Commission denied these requests, saying that "the procedure governing this type of case does not provide for a hearing at any stage of the proceedings" and "does not permit the Commission to divulge the source of information given in confidence," but that "the Com-

mission will reach a decision after careful consideration of all the available information together with any comments or explanations you submit in writing." Plaintiff reiterated his demand for an open hearing and for disclosure of the sources of the adverse information; in the absence of such procedure, which he deemed required by the Constitution, he would not comment on or explain the substance of the charges.

On August 6, 1962, without acceding to these requests, the Commission terminated plaintiff's annuity on the ground that he had made intentional false statements and concealed material facts with respect to his affiliation with an organization which advocates the overthrow of the United States Government by force, violence, or unconstitutional means. He was told that, on application, he would be refunded the balance of his contributions to the retirement fund, with interest, after deduction of the amount of retirement pay already received. The Commission's Board of Appeals and Review affirmed the administrative decision to terminate the annuity, and this suit was then brought on January 24, 1963. Both parties have moved for summary judgment; there is no disagreement as to any relevant fact.[4]

Plaintiff directs a series of statutory and constitutional assaults against the Commission's action,[5] but we consider

---

side the United States, or any other organization, party, or group advocating (A) the overthrow, by force, violence, or other unconstitutional means, of the Government of the United States, (B) the establishment in the United States of a Communist totalitarian dictatorship, or (C) the right to strike against the Government of the United States;

"(2) conviction of any offense described in the first section of this Act; or

"(3) failure or refusal to appear, testify, or produce any book, paper, record, or other document as specified in subsection (a) of this section,

for any period subsequent to the date of enactment of this Act or the date on which any such statement, representation, or concealment of fact is made or occurs, whichever is later, in connection with his application for an office or position in or under the executive, legisla-

tive, or judicial branch of the Government of the United States or the government of the District of Columbia, or to the survivor or beneficiary of such person, any annuity or retired pay on the basis of the service of such person as an officer or employee of the Government."

4. It is also agreed that the only statutory basis for the denial of plaintiff's deferred annuity, at age 62, could be Public Law 769 of the 83rd Congress, the Act of September 1, 1954, as amended by Public Law 87–299, the Act of September 26, 1961, supra. The general provision of the retirement law barring an immediate annuity for employees removed for cause (5 U.S.C. § 691(c)) is inapplicable to an annuity at age 62.

5. These arguments are: (1) that neither the 1954 statute nor the 1961 amendment authorized the Commission to deprive

only the first of these challenges—that the statute should be read as not empowering the Commission to deny or deprive him of this annuity without a trial-type hearing. We accept that contention, and it is enough to dispose of the case.

Within the past decade the principle has ripened, and is now in full maturity, that an agency of the Federal Government cannot, without permitting cross-examination and confrontation of adverse witnesses, take detrimental action against a person's substantial interests on loyalty or security grounds—unless, at the least, Congress (or the President, if he is the source of power) has expressly authorized the lesser procedure. Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), is, of course, the prime statement and illustration of this standard. The Supreme Court held that, though the Department of Defense was authorized to fashion a security program for the employees of government contractors working on defense projects, the Department could not, in the absence of a clear and explicit decision by Congress or the President, create a security system which denied the traditional procedural safeguards of confrontation and cross-examination. In the context of a security hearing, the Court pointed out that it was a normal precept of our jurisprudence that "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue" (360 U.S. at 496, 79 S.Ct. at 1413), and therefore that these "traditional forms of fair procedure" should "not be restricted by implication or without the most explicit action by the Nation's lawmakers" making it clear that "the President or Congress, within their respective constitutional powers, specifically has decided that [substandard] procedures are necessary and warranted and has authorized their use" (360 U.S. at 507–508, 79 S.Ct. at 1419). The Court proceeded on that same basis in Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 889–894, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) (holding, though, that explicit authorization had been given to the commanding officer of that military installation summarily to bar the civilian cafeteria worker without any hearing). Cf. Hannah v. Larche, 363 U.S. 420, 438–439, 452, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960); Aptheker v. Secretary of State, 378 U.S. 500, 503, 84 S.Ct. 1659, 12 L.Ed.2d 992 (n. 3) (1964). In the light of the Supreme Court's position and of post-1950 rulings in the Courts of Appeals,[6] the split decision of 1950 in Bailey

him of his annuity without a hearing; (2) that if the statute is read as granting that authority, it violates the Due Process clause of the Fifth Amendment, regardless of whether plaintiff's claim to the annuity is called a "vested right" or a "privilege" of some kind; (3) in the 1961 statute (enacted September 26, 1961) Congress did not intend to affect payments under annuities which had already vested, and plaintiff's annuity vested when he became 62 on July 13, 1961, since, in plaintiff's view, the prior 1954 Act did not seek to deprive a person in his class of a retirement annuity; (4) if the 1961 legislation did terminate plaintiff's previously vested annuity, the statute invalidly deprived him of property without just compensation; (5) in any event, the 1961 Act, as applied here, imposes punishment and is therefore invalid both because it does not incorporate all the protections of a criminal trial and because it is an ex post facto law.

6. In Parker v. Lester, 227 F.2d 708 (C.A.9, 1955), the Ninth Circuit rejected Coast Guard rules which denied even minimal confrontation and cross-examination to seamen being screened on security grounds, under the Magnuson Act, 64 Stat. 427, 1038, 50 U.S.C. §§ 191, 192, 194, for employment on American merchant vessels; the court, which acted prior to Greene, put its ruling on the Constitution but could as well have decided that the Magnuson Act, with its general wording, did not sanction the restricted procedure. See, also, Homer v. Richmond, 110 U.S.App.D.C. 226, 292 F.2d 719 (1961). In Bland v. Connally, 110 U.S.App.D.C. 375, 293 F.2d 852 (1961) and Davis v. Stahr, 110 U.S.App.D.C. 383, 293 F.2d 860 (1961), the District of Columbia Circuit held, following Greene, that the military could not dis-

v. Richardson, 86 U.S.App.D.C. 46, 182 F.2d 46, aff'd by an equally divided court, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352 (1951), is no longer authoritative on this point.

The statute under which the Civil Service Commission acted here is undoubtedly the kind of legislation to which the test of Greene v. McElroy must be applied. The charge made under the Act directly affected plaintiff's loyalty since he was accused of lying as to his membership in and association with a group advocating violent overthrow of the Government. Greene faced a security charge, not necessarily involving his own personal loyalty. The reasons which prompted the Supreme Court to articulate the rule of Greene v. McElroy have even greater force in a proceeding disputing a person's loyalty to the country. "In the view of the community, the stain [of a finding of disloyalty] is a deep one; indeed, it has become a badge of infamy." Wieman v. Updegraff, 344 U.S. 183, 191, 73 S.Ct. 215, 218, 97 L.Ed. 216 (1952). See, also, Cafeteria & Restaurant Workers Union v. McElroy, supra, 367 U.S. at 898, 81 S.Ct. at 1750. In addition, the deprivation of a retirement annuity is not much different from the denial or severe diminution of a livelihood; for many, retirement pay is the mainstay of existence at the stage of life when one's ordinary work is no longer possible or available. In formulating the Greene test, the Supreme Court stressed the effect on the individual's livelihood of the challenged executive or administrative action. Greene v. McElroy, supra, 360 U.S. at 493, 500, 502, 506–507, 508, 79 S.Ct. 1400. There is a similar emphasis in Cafeteria & Restaurant Workers Union v. McElroy, supra, 367 U.S. at 895–896, 898–899, 81 S.Ct. 1743, and Willner v. Committee on Character & Fitness, 373 U.S. 96, 103–104, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963). The Supreme Court rulings make it plain, furthermore, that it does not matter whether the individual's interest is deemed a "right" or a "privilege"; where loyalty or security is involved and the impact of an unfavorable decision is substantial, there must be specific and clear authorization to withhold a full-scale hearing. Regardless, then, of the legal nature of plaintiff's annuity, we must gauge the retirement legislation which is before us by the Greene measure.

Under that standard, it is apparent that Congress did not give explicit or clear permission to dispense with the "traditional and well-recognized safeguards" which would accord an annuitant, actual or would-be, "the chance to challenge effectively the evidence and testimony upon which an adverse security [a fortiori, loyalty] determination might rest" (360 U.S. at 500, 502, 79 S.Ct. at 1416). Section 2(b) of both the 1954 and the 1961 Acts, 5 U.S.C. § 2283(b)(1), applying to government employees who have willfully given false statements as to their connection with the Communist Party or other subversive organizations, says nothing more than that such individuals cannot receive annuities. There is not a word on the procedure by which the critical facts are to be ascertained and determined (see footnote 3, supra); certainly, there is no express, explicit, specific, or clear authorization in this section (or elsewhere in the Acts) to refuse a trial-type hearing if the affected individual demands one. On the contrary, other provisions of the statute, as well as the legislative history, suggest that Congress predicated the denial of an annuity, otherwise earned, on solid proof through conventional procedures that the former employee had in fact done the condemned acts. Section 1 of both the 1954 and the 1961 statutes denies annuities to individuals *convicted* of specified criminal offenses. A conviction will only result, if the defendant demands a trial, after an open proceeding in which the accusing evidence is all produced and the opposing witnesses can be questioned.

charge an inactive reservist, under other than honorable conditions, for alleged subversive speech or associations without, at the least, allowing him to confront the witnesses against him and to know the adverse information.

Section 2 of both Acts, listing other conduct leading to denial of retirement pay, does not create crimes; but the legislation does characterize this proscribed conduct as "violations" and "offenses" (Sections 3 and 4 of the 1954 Act; Sections 4, 5, and 6 of the 1961 Act) and authorizes a Presidential pardon or amnesty to clear the slate, as for criminal convictions (Section 4 of the 1954 Act; Section 6 of the 1961 Act). The range and nature of these Section 2 "offenses" and "violations" is, moreover, such that they are just as likely as the Section 1 crimes to call for the adversary probing which is best done through a trial with confrontation and cross-examination; charges of subversive acts or associations often rest on inferences from undisclosed information or neutral conduct which can only be explained or correctly interpreted if brought into the open. These factors tend strongly to negative any implication that Congress considered Section 2 "offenses" less worthy of a full and careful trial-type hearing than the crimes specified in Section 1.[7]

The legislative history aids this conclusion. When the bill which became the 1954 Act was before the Senate, Senator Williams, a sponsor of the proposal, referred several times, in answer to inquiries from Senators who apparently wanted to be assured that annuities would be stopped only upon adequate proof of wrongdoing, to *convictions* by the *courts* as the prerequisite for deprivation of retirement benefits (100 Cong.Rec. 14780, 14781–82). These general comments on the limits of the bill were, of course, strictly applicable to Section 1 alone, but the underlying concept—

that a full determination of the facts would precede termination of the annuity—reaches Section 2 as well. For those cases a full administrative hearing could take the place of a criminal trial. In 1961 the same general thought was expressed by Congressman Davis, chairman of the interested subcommittee of the House Committee on Post Office and Civil Service and a sponsor of the amending bill, who told the House that the "bill will become operative only after the fact that the offense occurred has been duly established by a trial and conviction or otherwise by a duly constituted judicial or administrative tribunal, pursuant to other existing law" (107 Cong.Rec. 12248). In so close a comparison to a criminal trial, it would be most unusual to describe as an "offense" "duly established" "by a duly constituted * * * administrative tribunal" a finding of violation of Section 2 made by the Civil Service Commission without any hearing and, in large part, on the basis of its own confidential files. See, also, 107 Cong.Rec. 12245, 12246, 12247, 12248 (references, in the House floor debate, to "crimes," "conviction" of an "offense," and to those "guilty of a penal offense"). We think that Congress assumed that the annuitant would have, substantially, the major procedural protections available in the course of criminal trials—open presentation of the adverse evidence, the right of cross-examination, and the right to proffer his own witnesses and evidence.[8] Those protections were admittedly not accorded to plaintiff.

■ The proceedings in 1948–49, incident to plaintiff's discharge, are no substitute for the full hearing required

---

7. It is also significant that there would be no need, in a proceeding to deny or terminate an annuity, for a quick summary decision in order to protect the Government's operations from a disloyal employee—as there might be said to be where the employee was still working and the proceeding was one to suspend or remove him.

8. Defendant lists 12 claims under the 1954 Act which the Senate indicated would still be disallowed under the 1961 Act (see S.Rep. No. 862, 87th Cong., 1st

Sess. (1961), p. 2, U.S.Code Congressional and Administrative News 1961, p. 2928; 107 Cong.Rec. 19102, 19103, 19105, 19106) but there is no suggestion that these claims could be denied if the derogatory facts were not proved in a trial-type hearing. The Senate's position rested, we think, on the unelaborated assumption that the facts had been properly established. (The debate in that body on the 1961 Act centered, almost entirely, on the deletion of the non-security offenses which had been covered by the 1954 statute.)

by the retirement-denial statute of 1961, as properly read. It cannot be said either that plaintiff, by his choices of 13 years before, waived his right to such a hearing under the new law, or that the hearing he refused in 1948–49 satisfied the present requirement. Plaintiff did reject that tender of a hearing, but the earlier inquiry concerned his separation from the civil service, not his annuity on reaching the age of 62. At that time, the 1954 Act was more than five years in the future and the 1961 Act more than twelve years away. Plaintiff had no reason to believe that one consequence of his failure to insist on a hearing in 1948–49 would be the loss of his deferred annuity in 1961 or 1962. Even if the charge in the prior proceeding had been exactly the same as in 1962 and the hearing then offered would have allowed confrontation and cross-examination, we would be hard put to find an anticipatory waiver of a right to a hearing, not yet known or in existence, under a future statute which would impose a new and severe sanction. Cf. Homer v. Richmond, supra, 292 F.2d at 724. The 1948–49 charge was not, however, the same as that of 1962. For one thing, the former was framed, under Executive Order No. 9835, in terms of "reasonable grounds to believe" that plaintiff was disloyal. "Reasonable grounds to believe," like "probable cause," is an appreciably less exacting standard than affirmative proof of disloyalty itself. Cf. Beck v. Ohio, 85 S.Ct. 223; Brinegar v. United States, 338 U.S. 160, 174–176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Draper v. United States, 358 U.S. 307, 310–314, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). The retirement-denial statute, on the other hand, requires proof of the facts themselves, not merely a reasonable ground to believe that they exist; the 1962 charge was correctly so phrased.[9] The Departmental finding in 1949 reached no further than that "rea-

sonable grounds exist to believe that the respondent [plaintiff] is disloyal to the Government of the United States." There is no basis for saying that, if plaintiff had appeared and had a full hearing at that time, the administrative determination would have been any stronger. Secondly, the 1948–49 charge did not have as one of its components the accusation that plaintiff lied to the government; this is a material element of the charge under the new statute. Moreover, the hearings given under Executive Order No. 9835 did not usually permit cross-examination and confrontation of persons deemed confidential informants. See Part IV, pars. 2 and 3 of the Order, and Part II, pars. 2a, b; Peters v. Hobby, 349 U.S. 331, 335–336, 75 S.Ct. 790, 99 L.Ed. 1129 (1955); Bailey v. Richardson, supra, 182 F.2d at 51–52. Such a hearing, in any event, would not have complied with the requirements of the retirement-denial statute as it must be interpreted under the principle of Greene v. McElroy, supra.

Nor is there any legal significance to plaintiff's failure to deny the 1962 charge or to present his own materials or explanation in the 1962 proceeding. Since the statute gave him the right to a full hearing, he was free to stand on that right and to reject a lesser substitute. Cf. Cole v. Young, 351 U.S. 536, 540, 541, 76 S.Ct. 861, 100 L.Ed. 1396 (1956). This court does not hold, in federal personnel cases, that an employee dismissed for misconduct is barred from suing here, on the ground of denial of a procedural right, because he failed to assert or to insist that he was guiltless of the substantive charge. If the procedural violation nullifies the discharge, the plaintiff prevails even though he may have remained silent on the merits of the accusation. The same rule governs in this case.

9. The present record does not even show the details of the grounds upon which plaintiff was accused, and the Post Office Department acted, in 1948–49. We assume that the specifics were the same as those in 1962, but there is no proof

to that effect. If the underlying facts were different, that would be still another reason for disregarding the prior proceedings with respect to the need for a hearing under the new statute.

We must conclude, therefore, that the action of the Civil Service Commission in depriving plaintiff of his annuity violated the statute by refusing his request for the trial-type hearing to which he was entitled. The Commission's decision to end the annuity was unlawful and of no effect; plaintiff's right to his annuity continued and continues unabated under the Civil Service Retirement Act. We apply the established rule for personnel and pay cases—that unlawful administrative action depriving a claimant of a procedural right voids the action and leaves the plaintiff entitled to his money otherwise due, until (at the least) proper procedural steps are completed—and hold only that plaintiff may recover the withheld annuity to date of judgment. See, e. g., Washington v. United States, 147 F.Supp. 284, 288, 137 Ct.Cl. 344, 350 (1957); Watson v. United States, 162 F.Supp. 755, 759, 142 Ct. Cl. 749, 757 (1958).[10] Cf. Greene v. United States, 376 U.S. 149, 162, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964).

Defendant's cross-motion for summary judgment is denied. Plaintiff's motion is granted and we hold him entitled to recover; judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 47(c).

WHITAKER, Senior Judge (dissenting):

This case is not ripe for judgment. There are missing from the record now before us several facts which I think we must know before we can tell whether or not plaintiff is entitled to an annuity. If plaintiff was a Communist and lied about it or otherwise concealed it, he is not entitled to any annuity. Before we give him judgment I would like to know what the facts are. We should remand the case to a trial commissioner to ascertain these facts before we render judgment for or against plaintiff.

That the Civil Service Commission accorded plaintiff no hearing before revoking his annuity may have been unlawful, but it does not of itself entitle him to a judgment, if we can remedy the defect. If he is entitled to a hearing, why cannot we give him the hearing the Civil Service Commission should have given him? Ordinarily, we give a plaintiff a judgment where the administrative agency has not followed the prescribed procedure, but in this case I do not think we should do this. There are several facts about which I would like to be informed before I give him a judgment. I would like it to be determined whether he actually was a Communist and whether he had lied about it when questioned by his superiors. If so, I would not give him a judgment. I would like to have our trial commissioner inquire into all the facts in this case. Until that is done I do not think that we should render any judgment.

Public Law 87–299, the Act of September 26, 1961, 75 Stat. 640, 5 U.S.C. § 2283 (1958 ed., Supp. V), prohibits the payment of an annuity to an employee who was a member of the Communist Party or of any other organization which advocates the overthrow of this Government by force and violence and who had given a statement to the contrary or who had otherwise concealed such membership. It must be determined whether or not plaintiff was such an employee. The first question may have already been finally determined, but we cannot know whether or not it has been until we know the nature of the charges that were preferred against plaintiff when he was discharged in 1949.

The Loyalty Board found that there were reasonable grounds to believe that plaintiff was disloyal to the United States Government, but the record does not disclose whether or not this finding was based upon the fact that plaintiff was a member of the Communist Party or other organization advocating the overthrow of the Government of the United States by force or violence, or whether it was

10. Other recent examples include Tierney, v. United States, Ct.Cl., No. 128–59, decided Nov. 13, 1964; Paterson v. United States, Ct.Cl., No. 355–60, decided July 12, 1963, 319 F.2d 883; and Saltzman v. United States, 161 Ct.Cl. 634 (1963).

based upon one of the other matters which the Loyalty Board was authorized by Executive Order 9835, 12 Fed.Reg. 1935, 1937–39 (1947), 5 U.S.C.A. § 631, to take into consideration, in determining whether or not there were reasonable grounds to believe that an employee was disloyal to the United States. However, if the charges served upon this employee prior to his removal were that he was a member of the Communist Party and had attended meetings thereof and had been otherwise associated therewith—which seems likely—then the finding of the Board that there were reasonable grounds to believe that plaintiff was disloyal to the Government of the United States was tantamount to a finding that he was a member of the Communist Party as charged.

If it appears that the charges were those which I have supposed, then plaintiff's membership in this party has been finally established, because these Loyalty Boards were expressly authorized by Executive Order 9835, supra, which Executive Order, in turn, was promulgated pursuant to the authority of Section 9A of the Hatch Act, 53 Stat. 1148 (1939), 18 U.S.C. § 61i (1940 ed.)* (the Act of August 2, 1939, ch. 410, sec. 9A). They were set up for the express purpose of making a finding on whether or not reasonable grounds existed to believe that an accused employee was disloyal to the United States.

Plaintiff did not appear before this Loyalty Board, although it was at his request that it had been convened to hear the charges against him, and plaintiff took no appeal from its findings. Its findings are therefore final.

If there has been a final determination of the question of whether or not plaintiff was a member of the Communist Party, etc., we avoid the dilemma of deciding whether an individual's right to confront his accusers is paramount to the Nation's right to withhold information it considers essential to its defense.

Our trial commissioner, however, should receive evidence on whether or not plaintiff ever gave a statement to the effect that he was not a member of the Communist Party nor associated or affiliated therewith, and whether or not plaintiff otherwise concealed such membership. It is also pertinent to know whether or not plaintiff continued to conceal such membership after the passage of Public Law 87–299, supra. If he did not continue to conceal it after the passage of this act, this raises another constitutional question which we can decide after we know what the facts are.

In the foregoing, I have proceeded on the assumption that plaintiff was entitled to some sort of a hearing. The court holds he was entitled to a hearing where he would be confronted with the witnesses against him. I do not agree with this, first, because plaintiff refused to affirm or deny the facts defendant said it had in its files, to wit, that he was a member of the Communist Party and had lied about it when questioned, and, second, because of the court's definition of the nature of an annuity in Steinberg v. United States, 163 F.Supp. 590, 143 Ct. Cl. 1 (1958). In that case both Judge Laramore and Judge Littleton were of opinion that

> "The right of a Federal employee to an annuity is not born of a contractual relationship between the Government and the employee, but is more in the nature of a gratuity granted in appreciation for long and faithful service. Congress may in its wisdom modify the payments upward or downward without impairing the obligation of a contract. Dodge v. Board of Education, 302 U.S. 74, 58 S.Ct. 98, 82 L.Ed. 57; MacLeod v. Fernandez, 1 Cir., 101 F.2d 20, certiorari denied Taste v. MacLeod, 308 U.S. 561, 60 S.Ct. 72, 84 L.Ed. 471. * * *" [163 F. Supp. at p. 591, at p. 4.]

Both Judge Jones and I were of opinion that " * * * a Federal employee who has retired from the service has a vested right in the retired pay to which he was entitled at the time of his retire-

---

* Now 5 U.S.C.A. § 118j.

ment," [163 F.Supp. at p. 594, at p. 9] but we concurred in the judgment of the court upholding the suspension of the employee's annuity.

Judge Madden dissented. In his opinion he agreed with Judge Laramore and Judge Littleton that plaintiff had no contractual right to his retired pay and that "Congress could have, by a generally applicable statute, reduced the retired pay of all retired employees. Dodge v. Board of Education, 302 U.S. 74 [58 S.Ct. 98, 82 L.Ed. 57]. * * * " [163 F.Supp. at p. 598, at p. 15.]

Thus the majority of the court thought that the retired pay of an employee could be reduced at the will of Congress.

If it be true that Congress at its will could have reduced the amount of the annuity to which plaintiff was entitled, upon reaching the age of 62, then it follows that it could have altogether abolished plaintiff's right to any annuity. It could have done so with or without giving the employee a hearing.

However, it must be said that plaintiff was entitled to some sort of hearing before it was determined that he came within the class of persons to whom the act prohibited the payment of any annuity, and the Civil Service Commission should have given him one, had he denied the information it said it had in its files. But plaintiff did not deny any part of it. He declined to affirm it or deny it, but, instead, demanded an open hearing at which he would be confronted by his accusers. In the absence of a denial of the accusations against him, I think the Civil Service Commission was justified in concluding that the information it had was true and in revoking plaintiff's right to the annuity.

Notwithstanding the foregoing, I think our trial commissioner should ascertain whether plaintiff was a member of the Communist Party, unless this has already been determined and whether he had lied about it when interrogated by his superiors or otherwise concealed it, and whether he continued to conceal it after the passage of Public Law 87–299, supra. In view of the nature of an annuity, as it has been defined, and the fact that plaintiff has entered no denial of the accusations against him, I do not think the Government should be compelled at this hearing to disclose information, the secrecy of which it considers essential to the national defense. I do not think Greene v. McElroy, 360 U.S. 474, 79 S. Ct. 1400, 3 L.Ed.2d 1377 (1959), requires this in a case like this.

I would overrule both motions for summary judgment and remand the case to a trial commissioner.

COWEN, Chief Judge, joins in the foregoing dissenting opinion.